IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN MURRAY and<br>SHARON MURRAY, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | Case No. 03-0206-CV-W-HFS |
| UNITED STATES OF AMERICA, et al., | )<br>)<br>) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

On April 27, 2001, the middle-aged plaintiff, John Murray, was walking in a pedestrian area adjoining a convenience store when he was struck by a vehicle operated by a postal worker that had gone out of control when the employee used the accelerator rather than the brake. Murray's right leg was badly injured by the vehicle and he briefly lost consciousness. After emergency room treatment he began a long recovery, which included an early brief hospitalization. He still has a distinctly "game leg", with permanent phlebitis (swelling and discomfort).

A tort claim against the United States was in contemplation from the first days of the injury, when a plaintiffs' attorney (current counsel) was suggested by one Sims, a close friend and business associate of plaintiff. Unfortunately that probably had a continuing effect on family appraisal–and thus medical and economic appraisal– of his situation. The initial complaint in this case claimed $5 million damages, including significant brain injury and crippling of Murray's personality, permanent painful and crippling leg injury, loss of anticipated income from a new job allegedly paying some $150,000 annually, impotency, large medical bills, past and future, and various equipment, therapy and household needs for the rest of his life. Murray was 58 years old at the time

of trial to the court and had been awarded Social Security disability payments. He has other significant health problems, such as diabetes, and has been accident prone, with some resulting disabilities. Complicating analysis is the existence of bilateral polyneuropathy, but I accept the claim that pain in the right leg greatly predominates.

Murray's wife Sharon's claims for loss of consortium are also in significant amounts, based on the above elements of claimed damages and the shift of family responsibilities to her.

Murray has a rather rugged and pleasing personality and an attractive but erratic history of service in law enforcement, fire department service and construction. His verifiable employment is remarkably elusive, with much job-hopping and activities that quickly dissipate–particularly in more recent years before the accident in question. He confesses to be willing to tell tall tales when financially needful. "Whatever it takes" was his motto for preparing a resume for employment. I doubt I have seen a rogue witness with more credibility problems, although they were not obvious from his manner of testifying. Murray's wife and good friend Sims were also not averse to supplying bizarre supportive testimony. I note, however, that their manner while testifying was also not obviously untruthful. But even a badly flawed and incredible presentation does not excuse a responsible party from compensating for significant injuries. I must guard against belittling a claim

because of annoyance.[1]  Flagrant overclaiming in the case in chief does require casting around for the most believable story and reaching for damage figures that are at least plausible.

The most compelling testimony presented was in depositions from Montana, plaintiffs' place of residence.  A sense of telling it like it is by knowledgeable witnesses came from Harold Hudson, chief of the fire department, and, to some extent, from Perry Mock, formerly chief of police, a person person once listed by plaintiff as a reference.  Hudson testified that Murray has recently been a volunteer road guard who drove equipment and directed traffic.  He does have a hard time getting around, walks slowly, and has had "problems" since his accident.  He limps occasionally and has complained about leg and back pain.[2]  He would have lifting problems and problems with strenuous physical work.  He has been helpful, however, in preparing paper work for grants.

Mock found that plaintiff wanted to do police work but could not shoot well enough.  He has a "gift for gab" and promoted an equipment buying plan from a "huge organization" he owns in Kansas City.  Mock noted no mental confusion or memory problems and viewed him as the "same Murray" he knew in the 1980s.  He responds to traffic accidents and works traffic.  Mock did not

---

[1] Without fully detailing credibility problems (which can be done by defendant on any appeal) I note, for example, apparent undocumented oddities or overclaiming as to (1) educational level, (2) income tax history, (3) future job prospects, (4) claims of inability to drive, degree of home confinement, degree and continuing nature of mental confusion and, reduced ability to communicate, (5) ownership of a business in Kansas City that could supply equipment, and (6) a certificate in law enforcement (despite firearms skills inadequacy).  Not being clairvoyant it is possible that I have an unduly critical appraisal of some of the above, and it is conceivable that the absence of credible documentation was caused, in part, by inadequate trial preparation in handling an exceedingly complex life history.  Even if there are good answers to some of these questions, if only a third of the contentions are fabricated, delusional, or the result of self-serving memories, it becomes hazardous to rely on any of the assertions advanced by plaintiffs.  We instruct juries that where credibility issues come to the fore, "you may believe all of what a witness said, or only part of it, or none of it".  8th Circuit Committee Model Instruction, Civil # 3.03

[2] Back pain may well be associated with walking problems associated with the accident.

observe limping or favoring one leg and questioned plaintiff's credibility. I do not rely on Mock's recollection or opinion in these particular respects, although my observation of Murray over some days was that he was a witness of average responsiveness and had a moderate tendency to limp.

## Valuation of Loss[3]

### A. Effect of Leg Injury

I shall combine an allowance for physical pain and suffering and an allowance for interference with physical activity as a "social" loss. This is because I am unable to give a reasonable estimate for economic loss, if any, from employment limitations. Plaintiff's employment record is such that I do not have the foggiest notion of what plaintiff might have been expected to earn from gainful employment before slipping into early semi-retirement and volunteer work such as he has performed recently.[4]

Plaintiff's reliance on possibly making "big money" from construction management work for Sims or another employer creates grave credibility problems in addition to being speculative and out of character. Even if I assume he was able briefly to take over construction work in a managerial capacity at a time when Sims was unavailable I am not satisfied that this was more than a holding operation, unlikely to recur. It does not evidence, according to the record, considerable prior ability

---

[3]The following comparatively simple review can be profitably supplemented by reference to the Government's proposed findings, which are largely persuasive, although I do not endorse some of the criticism of professionals, for example.

[4]Calculations based on industry average and the like are often useful guides. I am satisfied I should not rely on them, however, when individual peculiarities create special doubt about a claimant's job prospects, absent the injury.

to manage , take a leadership role and put things together accurately for construction work. Even if the Sims offer was a reality it was dependent on a contract award that never happened.

For reasons reiterated below, I do not accept a claim that plaintiff was mentally incapacitated, on an indefinite or permanent basis, by his most recent injury. I conclude he is mentally as able to handle employment as he was before the injury. How "swift" he was before, given his educational limitations, is not clear. Even assuming some mental set-back from the injury, for a matter of months, I would analogize this to possible impotency related to the injury (where any continuing effect would not have a provable physical connection with the injury, according to the record).

As Hudson confirmed, there has been continuing pain, suffering and physical limitations imposed by the injury to Murray's leg. Even if there are also some problems with the left leg, as the Government claims, those problems are comparatively minimal. The recovery has been less than might normally be expected. Accepting the testimony of both plaintiffs, with more than a grain of salt, I conclude the injury deserves a substantial award, if I also include life-style effects. A fair allowance would, in my judgment, be $800,000.

B. Mental Condition

To elaborate somewhat on what I have already stated, I am unable to make an award for brain damage for several reasons. There was a rather brief period of unconsciousness, which can be classified as the result of concussion. The likelihood of permanent brain damage seems far less than could have occurred from the much more serious vehicle injury in 1992. A high incidence of permanent brain damage from a brief period of unconsciousness has not been shown, and if a small

5

percentage of persons who have been "knocked out" do suffer permanent injury, I am skeptical of the testimony that the trauma to the leg may have had a lasting effect on plaintiff's mental capabilities. Plaintiff was reasonably alert, and giving directions, while still at the site of the injury–and was a fully competent witness. We do have a mental test that shows plaintiff somewhat behind what might be expected from a person as educated as he claimed to be. But the education claim is not credible (other than perhaps auditing some classes) and there are no statistics as to plaintiff being below average for persons with the education actually received. The testimony of Sharon Murray is not accepted as proof of a great loss of mental ability for several reasons. From day one she has had an incentive to look for problems, issues that she may not have been alert to before the injury. I would suppose that for a time plaintiff's mental condition was affected, and that was quite noticeable if you were looking for it. Comparison with how plaintiff may have been a year after the accident and what she remembers about his mental state before the accident can easily convert a vague impression of new problems into testimonial certainty. More reliable and objective testimony was offered in the Montana depositions.

### C. Medical and Lifestyle Needs

Not least of the difficulties in spelling out the damages is an appraisal of past and future expenses. I am not inclined to be too critical of expenditures apparently related to the accident. The Government's suggestion of a $40,000 allowance is persuasive but I will allow $46,000, a sum concentrating on the early period after the injury. I am, however, dubious, to the point of non-allowance, of predicted medical needs and lifestyle needs that allegedly relate to this accident.

6

Recommendations from professionals about future needs are badly tainted by their reliance on unreliable family reports. This includes long term use of what the Government refers to as "high dose narcotic pain medication". One of the doctors seemed startled when I inquired about how carefully he examined the credibility of claims. Usually it is assumed that patients report conditions accurately to obtain needed assistance. In a case driven by deep-pocket expectations, however, a trier of fact should approach the subject much more critically than some doctors do.

To use an example in the much-debated coumadin prescription, I doubt the attribution of future coumadin needs to the leg condition alone, or that coumadin would be reasonably predicted for life simply because we have a badly healed leg. I accept the analysis on pages 8 and 9 of the Government's proposed findings and conclusions. I also have no expectation that plaintiffs would use money for medication, equipment and future therapy as recommended, or that large sums of money would be spent for the purposes stated, either by a financially independent patient without coverage or after an allowance in this case. The plaintiff of course is likely to have medical needs in the future, but I cannot reasonably allocate them to this accident.

### D. Impotence and Consortium

For reasons indicated I am unconvinced by testimony this couple had a vigorous sex-life and that the leg injury has permanently destroyed that situation. I am, however, satisfied that Sharon Murray has been forced to assist her husband much more than before and that he has been disabled from household chores that otherwise would have been performed by him. An award of $75,000 will be made to Mrs. Murray.

7

E.  Agreed Credit

Under a confidential agreement, submitted under seal, and examined by me after deciding the other issues in the case, solely for the purpose of making a judgment entry, the recovery above specified will be reduced by $205,000.  Roughly allocating this credit between the parties, $20,000 will be reduced from the recovery otherwise obtained by Sharon Murray and $185,000 will be reduced from John Murray's recovery.

It is therefore ORDERED that judgment be entered in favor of John Murray against the United States in the amount of $661,000 and in favor of Sharon Murray against the United States in the amount of $55,000.  It is further ORDERED that all other pending motions are denied as moot.

/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

February 17, 2006

Kansas City, Missouri

8